# IN THE SUPREME COURT OF IOWA

No. 22–1232

Submitted November 15, 2023—Filed June 28, 2024

**STATE OF IOWA,**

    Appellee,

vs.

**KYRA ROSE BAULER,**

    Appellant.

---

Appeal from the Iowa District Court for Plymouth County, Jeffrey A. Neary, Judge.

A defendant appeals the denial of her motion to suppress, challenging the stop of her vehicle, the open-air dog sniff performed on her vehicle, and the search of her purse. **AFFIRMED.**

Mansfield, J., announced the judgment of the court and delivered an opinion, in which Christensen, C.J., and Waterman, J., joined. McDonald, J., filed a special concurrence in which May, J., joined, and Oxley, J., joined as to parts I–II but not the judgment. Oxley, J., filed a dissenting opinion, in which McDermott, J., joined as to parts II–VI. McDermott, J., filed a dissenting opinion.

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Joshua A. Duden (argued), Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

We are called upon to decide whether the United States or the Iowa Constitution was violated when a K-9 handler and his trained canine momentarily made contact with the exterior of a vehicle while performing an open-air dog sniff. We conclude that ruff justice is inevitably going to be rough justice, and that the legality of a dog sniff does not turn on the fine point of whether the handler or the dog briefly touched the outside of the vehicle, so long as there was no entry into the private space inside the vehicle. As the United States Supreme Court has said, dog sniffs are "sui generis" because they reveal no protected information about the target of the sniff—only the presence or absence of contraband. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *United States v. Place*, 462 U.S. 696, 707 (1983). Thus, details about *how* the dog is performing the sniff should not matter so long as the dog is in a *place* where police have a right to be. In fact, we should want the dog to do what it needs to do to assure the results of the sniff are as accurate as possible. Accordingly, we affirm the order denying the motion to suppress and affirm the defendant's convictions and sentence.

### II. Facts and Procedural History.

On a cold evening in January 2021, Plymouth County Deputy Sheriff Jaycee Vander Berg was on patrol when she noticed a car driving north on Highway 75 at approximately fifty-five miles per hour where the posted speed limit was sixty-five miles per hour. The car was proceeding slower than most vehicles in heavy traffic. Vander Berg followed the vehicle as it exited the highway and entered the parking lot of a gas station in Hinton. Vander Berg ran the plates on the vehicle. She learned that the car was registered to Kyra Bauler and that Bauler had a history of drug offenses.

Vander Berg continued to follow the vehicle as it left the gas station and kept going north on Highway 75. The posted speed limit was sixty-five miles per hour, but the car was now driving forty-five miles per hour. Traffic was still heavy, and Vander Berg observed that the car's low speed was creating traffic problems. She witnessed vehicles "trying to get around" the vehicle. Vander Berg described the situation as "kind of messy" and creating a "hazard." Vander Berg also saw the vehicle cross the centerline multiple times and ride along the fog line for some time.

At this point, Vander Berg intended to stop the vehicle, but she waited to see if the vehicle would take the upcoming exit because she believed that a stop off of the highway would be safer. The vehicle did take the next exit, and Vander Berg began to pull closer to the vehicle to make the stop. While this was going on, Vander Berg contacted Officer Bob Rohmiller of the Le Mars Police Department and asked him to bring his canine to the scene. Vander Berg believed that "drug related activity [was] taking place," and she wanted Rohmiller to conduct a dog sniff of the vehicle.

After contacting Rohmiller, Deputy Vander Berg stopped the vehicle. The driver of the vehicle was indeed Bauler. Vander Berg approached the driver's side of the vehicle. Bauler asked why she was being stopped. Vander Berg informed Bauler that the reason for the stop was her crossing the center line three times, crossing the fog line once, and driving forty-five miles per hour in a sixty-five miles per hour zone. Vander Berg added, "[T]here's reason to believe that potentially you could be impaired in some sort of way." Vander Berg requested Bauler's driver's license and proof of insurance. Bauler handed Vander Berg her license but could not immediately produce proof of insurance, and Vander Berg asked Bauler to come with her to the front interior of her patrol car with the stack of papers she was ruffling through. Bauler complied with this request, and

she brought her purse with her. Vander Berg noticed that Bauler was sweating and thought it was "odd" because the temperature was below freezing.

In the patrol car, Bauler said she didn't have the proof of insurance with her in the vehicle but did have insurance coverage. Vander Berg said she would issue a citation for failure to provide proof of insurance that could be cured by providing proof of insurance. After Vander Berg had called in Bauler's driver's license, and while she was still writing up the citation and the warning for the lane violations, Rohmiller arrived at the scene with his canine. This was less than ten minutes into the stop.

Rohmiller also noted Bauler's appearance in the patrol car. He observed that Bauler's eyes were bloodshot, her eyelids were droopy, and she was easily agitated. Rohmiller and Vander Berg asked Bauler for permission to search her vehicle. Bauler refused. Rohmiller directed the dog to conduct an open-air sniff around the exterior of Bauler's car. Rohmiller led the dog around Bauler's car at least twice. During the open-air sniff, Rohmiller's hand touched the car's exterior on several occasions to direct and "detail" the canine where to sniff. The dog's paws touched the car's exterior several times. While Bauler was seated in the patrol car with Vander Berg, she saw the dog's paws touching the car and complained. Vander Berg responded that she had worked with that dog, and it "doesn't have his claws out or nothing." Bauler acknowledged that but said, "It's a dog."

There is no evidence that the dog's paws in any way damaged Bauler's vehicle. At no point during the open-air sniff did either Rohmiller or the dog enter Bauler's vehicle.

The dog alerted to the presence of drugs on the passenger side of Bauler's car. At this point, Vander Berg converted the traffic stop into a drug investigation. The peace officers searched Bauler's vehicle and her purse. They

found a methamphetamine pipe, a makeup container with white crystalline residue, a small vial with powdery residue, and two small, taped packages. With Bauler's consent, the officers searched the packages and found a scale with white powder residue consistent with methamphetamine. Vander Berg placed Bauler under arrest and transported her to the Plymouth County Jail. During the booking process, jail personnel discovered Bauler had concealed on her body two clear plastic baggies holding 6.89 grams of methamphetamine.

The State charged Bauler in two separate criminal cases. In the first case, she was charged with operating while intoxicated (OWI), first offense, in violation of Iowa Code section 321J.2(2)(*a*) (2021). In the second case, she was charged with possession with intent to deliver more than five grams of methamphetamine, in violation of Iowa Code section 124.401(1)(*b*)(7); introduction of contraband into a correctional facility, in violation of Iowa Code section 719.7(3)(*a*); and possession of a controlled substance, third offense, in violation of Iowa Code section 124.401(5).

Bauler moved to suppress evidence under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. Both constitutions protect persons against unreasonable searches and seizures. *See* U.S. Const. amend. IV; Iowa Const. art. I, § 8. In the OWI case, Bauler argued Vander Berg did not have legal cause to initiate a traffic stop. In the drug case, Bauler reiterated her argument regarding the legality of the traffic stop. She also argued that the open-air sniff around the exterior of her vehicle was an unconstitutional search because Rohmiller and the dog touched the exterior of her vehicle without having a search warrant. The district court denied the motions to suppress.

The State and Bauler then agreed that the State would dismiss the charge of possession with intent to deliver and hold a trial on the minutes for the

remaining charges. Following a trial on the minutes, the district court found Bauler guilty on the three remaining counts. Bauler timely filed this appeal. We retained the appeal.

### III. Standard of Review.

"We review the district court's denial of a motion to suppress based on deprivation of a constitutional right de novo." *State v. Arrieta*, 998 N.W.2d 617, 620 (Iowa 2023). We independently evaluate the entire record and consider the totality of the circumstances. *Id.* We defer to the findings of fact made by the district court, "but we are not bound by them." *Id.*

### IV. Legal Analysis.

On appeal, Bauler raises three search-and-seizure arguments. First, she challenges Deputy Vander Berg's traffic stop of her vehicle. Second, she challenges the dog sniff performed by Officer Rohmiller's canine. Third, she challenges the search of her purse.

**A. The Traffic Stop of the Vehicle.** We first address the constitutionality of the traffic stop. The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" article I, section 8 and the Fourth Amendment. *State v. Warren*, 955 N.W.2d 848, 859 (Iowa 2021) (alteration in original) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). A traffic stop is reasonable and thus constitutional "when supported by probable cause or reasonable suspicion of a crime." *State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015). "Probable cause exists if the totality of the circumstances as viewed by a reasonable and prudent person would lead that person to believe that a crime has been or is being committed and that the arrestee committed or is committing it." *State v. Tague*, 676 N.W.2d 197, 201 (Iowa 2004) (quoting *State v. Bumpus*, 459 N.W.2d 619, 624 (Iowa 1990)).

Reasonable suspicion exists when "all the circumstances confronting the officer at the time give rise to a reasonable belief that criminal activity may be afoot." *McIver,* 858 N.W.2d at 702. "When a peace officer observes any type of traffic offense, the violation establishes both probable cause to stop the vehicle and reasonable suspicion to investigate." *Id.*; *see also Tague,* 676 N.W.2d at 201 ("When a peace officer observes a violation of our traffic laws, however minor, the officer has probable cause to stop a motorist.").

Under Iowa law, it is a simple misdemeanor to drive at a speed "less than is reasonable and proper, having due regard to the traffic." Iowa Code § 321.285(1), (8). In addition, Iowa Code section 321.294 provides that "[a] person shall not drive a motor vehicle at such a slow speed as to impede or block the normal and reasonable movement of traffic." Section 321.294 allows an officer "to enforce this provision by directions to drivers"—an act that presumably requires *stopping* the vehicle. A driver's failure to comply with said directions shall be a simple misdemeanor. *Id.* Bauler's abnormally slow driving "impede[d] . . . the normal and reasonable movement of traffic," *id.*, and demonstrated a lack of "due regard to the traffic," *id.* § 321.285(1). As Deputy Rohmiller put it, Bauler came to her attention "because she was driving differently than all the vehicles around her and in a poor driving behavior."

Bauler has two rejoinders. She argues that there was no minimum speed limit on that segment of Highway 75. But neither section 321.285 nor section 321.294 requires a violation to be triggered by a motorist driving below the posted speed limit. Instead, the statutes require only a certain effect on traffic and safety. Here, Vander Berg testified that Bauler's slow driving was impeding the normal flow of traffic in violation of the statute. Vander Berg witnessed cars continually changing lanes and "fighting" to pass Bauler's slow-moving vehicle. Vander Berg testified it was "kind of messy" and Bauler's slow driving was

creating a "hazard." That was sufficient to establish probable cause for the traffic stop. *See id.* §§ 321.285(1), .294.

Bauler also contests the sincerity of Vander Berg's stated justifications for the traffic stop. Bauler contends that Vander Berg's observations were undermined by her own decision to follow Bauler for fifteen minutes, or roughly eleven miles, at the same slow speed without stopping her. In Bauler's view, Vander Berg's delay in initiating the stop demonstrated that she didn't believe there was a genuine driving hazard. But "[t]he motivation of the officer stopping the vehicle is not controlling in determining whether reasonable suspicion existed. The officer is therefore not bound by his real reasons for the stop." *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) (quoting *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002)). Beyond that, Vander Berg provided a reasonable explanation for the delay. She decided to wait to initiate the stop because it "would be safer off the highway than on it."

For the foregoing reasons, we conclude the district court properly overruled Bauler's objections to the stop of her vehicle. Because we find that Vander Berg had probable cause to pull over Bauler's vehicle due to its unusually slow speed, we need not and do not decide whether there were other legally sufficient reasons for the stop.

**B. The Dog Sniff of the Vehicle.** We next consider the legality of the dog sniff. Bauler concedes that an open-air dog sniff that takes place *outside* a vehicle does not violate the Fourth Amendment to the United States Constitution or article I, section 8 of the Iowa Constitution. *See, e.g.*, *State v. Bergmann*, 633 N.W.2d 328, 334 (Iowa 2001) ("[A] dog sniff that occurs outside a vehicle is not a search under the meaning of the Fourth Amendment."). However, she contends that "[b]ecause both Officer Rohmiller and the dog physically trespassed on Bauler's car with the purpose of obtaining evidence, the sniff of

the vehicle constituted a search." She raises this argument both under the Fourth Amendment and under article I, section 8.

1. *The dog sniff under the Fourth Amendment.* The United States Supreme Court has addressed the legality of canine sniffs on several occasions. *United States v. Place* involved a canine sniff of luggage. 462 U.S. at 706–07. The Court held that "exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment." *Id.* at 707. The Court reasoned that a canine sniff of luggage did not violate an expectation of privacy because it does "not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage." *Id.* "Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited." *Id.* The Court concluded that "the canine sniff is *sui generis*" because "no other investigative procedure . . . is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id.*

In *City of Indianapolis v. Edmond*, the Court addressed the legality of a road checkpoint at which dog sniffs were performed. 531 U.S. 32, 40 (2000). The Court concluded that *the checkpoint stop* violated the Fourth Amendment because its purpose was general investigation rather than road safety. *See id.* at 41–42. But the Court reiterated that "[t]he fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search." *Id.* at 40. "Just as in *Place*, an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence

of narcotics." *Id.* The Court reasoned that a dog sniff around the car is "much less intrusive than a typical search." *Id.* (quoting *Place*, 462 U.S. at 707). So, the problem in *Edmond* was the stop, not the sniff.

The Court next addressed dog sniffs in *Illinois v. Caballes*, 543 U.S. 405. That case involved a warrantless canine sniff around the exterior of a vehicle during a lawful traffic stop. *Id.* at 406. The Court held that a dog sniff of the exterior of a vehicle during a lawful traffic stop does not violate the Fourth Amendment. *See id.* at 409–10. Specifically, the Court reiterated that dog sniffs are "sui generis" because they only reveal the presence or absence of contraband. *Id.* at 409 (quoting *Place*, 462 U.S. at 707). The Court concluded, "[T]he use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Id.* That language, we believe, controls this case and forecloses Bauler's constitutional challenge.

Bauler does not discuss or even cite *Caballes*. Instead, she relies on two post-*Caballes* decisions. In *United States v. Jones*, the Court held "that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitute[d] a 'search'" within the meaning of the Fourth Amendment and was thus unlawful when done without a warrant. 565 U.S. 400, 404 (2012) (footnote omitted). In reaching that conclusion, the Court relied on common law concepts of trespass. *See id.* at 404–11. The Court explained that the Fourth Amendment embodies a "particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Id.* at 406. The legality of an officer's warrantless conduct could thus be decided using a "common-law trespassory test." *Id.* at 409. The Court reasoned that the government's "physical intrusion" failed that test. *Id.* at 404.

*Jones* did link its Fourth Amendment analysis to common law concepts of trespass. *See id.* at 404, 409. But "[i]t is important to be clear about what occurred . . . : The Government physically occupied private property for the purpose of obtaining information." *Id.* at 404. The government attached an electronic tracking device to the undercarriage of Jones's vehicle and tracked his movements for twenty-eight days. *Id.* at 403. During that time, the government collected more than 2,000 pages of data regarding Jones's movements. *Id.* The Court repeatedly emphasized that affixing or mounting a GPS device to a vehicle for twenty-eight days was a "physical intrusion." *Id.* at 404. "[W]hen the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." *Id.* at 407 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring)).

The dog sniff of Bauler's vehicle did not involve an extended physical occupation or physical intrusion akin to that in *Jones*. Instead, it involved only fleeting contact with the exterior of a vehicle. A federal district court found "no authority for the proposition that the momentary light touch of the exterior of a vehicle or other personal conveyance by a dog—or a person, for that matter—on a public roadside, amounted to a trespass at common law." *United States v. Acuna*, No. 21–10035–01, 02–JWB, 2022 WL 3081419, at *6 (D. Kan. Aug. 3, 2022). Minimal contact with the exterior of a vehicle does "not rise to the level of a constitutionally cognizable infringement." *United States v. Olivera-Mendez*, 484 F.3d 505, 511–12 (8th Cir. 2007) (quoting *Caballes*, 543 U.S. at 409).

Further, unlike in *Jones*, the search in this case could not reveal any legal activity. "[T]he tracker in *Jones* monitored the defendant's every movement, providing the government evidence of both his legal and illegal activities. *Jones* did not state that an intrusion onto an individual's [personal] property to gather

only information about illegal activity was an unconstitutional search." *Oprisko v. Dir. of the Dep't of Corrs.*, 795 S.E.2d 739, 745 (Va. 2017) (citation omitted). *Jones* does not alter the conclusion that we must reach based on *Caballes.*

Bauler also relies on *Florida v. Jardines*, 569 U.S. 1 (2013). In that case, the Court held a peace officer conducted an unconstitutional search when the officer walked onto a homeowner's porch with a drug-sniffing dog to investigate the contents of the home. *Id.* at 9–10. The Court explained an officer acting without a warrant had the right to do what "any private citizen might do." *Id.* at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). The Court explained that a private citizen had an implied license that "permit[ed] the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* There was no implied license, however, to introduce "a trained police dog to explore the area around the home in hopes of discovering incriminating evidence." *Id.* at 9. "[S]ocial norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* Because the police gathered information "by physically entering and occupying" the curtilage of Jardines's home, the police conducted an unconstitutional warrantless search. *Id.* at 6.

Critical to the holding in *Jardines* was that the conduct involved a trespass onto real property—specifically, the home. *Id.* "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Id.* The Court explained that at the Founding, the "law [held] the property of every man so sacred, that no man [could] set his foot upon his neighbour's close without his leave." *Id.* at 8 (quoting *Entick v. Carrington* (1765) 95 Eng. Rep. 807, 817 (KB)). In other words, any unauthorized intrusion onto real property constituted a trespass at common law. *See* 3 William Blackstone, *Commentaries* \*209 ("[E]very entry . . . without the

owner's leave, and especially if contrary to his express order, is a trespass or transgression . . . . Every unwarrantable entry on another's soil the law entitles a trespass by *breaking his close . . . .*").

Unlike *Jardines,* this case does not involve a physical trespass onto real property. *See Jardines,* 569 U.S. at 3–4. *Jardines* has no application to a canine sniff conducted around the exterior of a vehicle in a public place during a lawful traffic stop. *See United States v. Moore,* No. 22–30009, 2023 WL 6937414, at *3 (9th Cir. Oct. 20, 2023) ("Although law enforcement may not conduct a dog sniff of a person's home or its immediate surroundings without a warrant, police are not required to obtain a warrant before conducting a dog sniff of a vehicle during a lawful traffic stop." (citations omitted)); *United States v. Bain,* 874 F.3d 1, 15 (1st Cir. 2017) (explaining that *Jardines* was different from *Caballes* "because it concerned a house rather than an effect"); *United States v. Winters,* 782 F.3d 289, 305 (6th Cir. 2015) ("*Jardines* does not call *Caballes* and its progeny into doubt."); *United States v. Seybels,* 526 F. App'x 857, 859 n.1 (10th Cir. 2013) (noting that *Jardines* "was based on property rights not implicated in the traffic stop context and, hence, did not undermine *Caballes*"); *United States v. Lewis,* No. 1:15–CR–10–TLS, 2017 WL 2928199, at *6 (N.D. Ind. July 10, 2017) ("*Jardines* did not purport to overrule *Caballes* and the well-settled proposition that a dog sniff is not a Fourth Amendment search if it is conducted by law enforcement from an area they have a legal right to be. Neither has any other Supreme Court decision."); *United States v. Cordero,* No. 5:13–cr–166, 2014 WL 3513181, at *9 (D. Vt. July 14, 2014) ("*Jardines* did not reverse the Court's decisions holding that canine sniffs during traffic stops do not implicate the Fourth Amendment . . . ."); *United States v. Taylor,* 979 F. Supp. 2d 865, 881–82 (S.D. Ind. 2013) (stating that "nothing in *Jardines* disturbed th[e] well-settled proposition" that "dog sniffs conducted by law enforcement from an area they

have a legal right to be do not constitute a Fourth Amendment search" ); *State v. Miller*, 766 S.E.2d 289, 293 (N.C. 2014) ("Nonetheless, insofar as *Place*, *Edmond*, and *Caballes* encourage police to utilize dog sniffs in the public sphere, the Court's recent decision in [*Jardines*] places police on a much shorter leash when employing dog sniffs in and around the home."); *State v. Candler*, No. 2015AP2212–CR, 2016 WL 7234714, at *3 (Wis. Ct. App. Dec. 14, 2016) (per curiam) ("But *Jardines* did not expressly or impliedly overrule *Caballes* or any state cases relying on it. . . . Rather, *Jardines* was based on property rights, and the fact that—unlike the public spaces surrounding a vehicle—the curtilage of a home is a constitutionally protected area." (citation omitted)).

Even when read together, *Jones* and *Jardines* do not support Bauler's contention that mere touch of a car in a public place by an officer or a canine violates the Fourth Amendment:

> This momentary touching is materially different from the officers' physical intrusion to conduct a search on the porch of a home in *Jardines* and even from the physical attachment of a tracking device to the undercarriage of a vehicle in *Jones*. It is one thing to say property law has conferred upon the owner of a vehicle the right or reasonable expectation of excluding others from physically attaching a tracking device to his car without consent. But it is qualitatively different to suggest property law has conferred a right or expectation of precluding any person or dog from momentarily touching the exterior of a vehicle or other conveyance located in a public place. At common law, "[t]he interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel." Rather, liability arises only if intermeddling with the chattel "is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected . . . ." The absence of any trespass analog to these facts distinguishes *Jones* and *Jardines* and supports a finding that the sniff did not violate Defendants' Fourth Amendment rights.

*Acuna*, 2022 WL 3081419, at *6 (alteration and omission in original) (citation omitted) (quoting 1 Restatement (Second) of the Law of Torts § 218 cmt. *e*, at 421 (Am. L. Inst. 1965) [hereinafter Restatement (Second)])

Although *Jones* and *Jardines*, properly understood, do not support Bauler's federal constitutional claim, her reliance on those cases is problematic for an additional reason: this court is bound to follow *Caballes* despite any subsequent doctrinal developments. The Supreme Court has explained that "[i]f a precedent of th[e] Court has direct application in a case," then courts "should follow the case which directly controls, leaving to th[e] Court the prerogative of overruling its own decisions." *Mallory v. Norfolk S. Ry.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). This is true even if other courts think the controlling precedent is in tension with "some other line of decisions." *Id.* (quoting *Rodriguez*, 490 U.S. at 484). Although Bauler does not cite *Caballes*, it is clearly the controlling case for resolving this appeal. There, the Court held that "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Caballes*, 543 U.S. at 410. Those are the facts of this case. If there is a tension between *Caballes* and the Supreme Court's subsequent Fourth Amendment jurisprudence as articulated in *Jones* and *Jardines*, it is, per the Supreme Court's own instruction, for the Supreme Court to resolve.[1]

---

[1]Furthermore, to read tea leaves, one must look at the entire teacup. In *Rodriguez v. United States*, which was decided after *Jones* and *Jardines*, the Supreme Court addressed a follow-on issue raised by *Caballes*. *See* 575 U.S. 348, 350–51 (2015). The Court discussed *Caballes* at some length, certainly leaving the impression that *Caballes* was still good law. *See id.* at 350–51, 353–54. Indeed, the Court reiterated *Caballes*'s holding in the first sentence of its *Rodriguez* opinion. *Id.* at 350 ("In *Illinois v. Caballes*, this Court held that a dog sniff conducted

We find the dog sniff of Bauler's vehicle did not violate the Fourth Amendment, notwithstanding the brief touching of the exterior of the vehicle.

2. *The dog sniff under article I, section 8.* "We generally 'interpret the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment' because of their nearly identical language." *Brown*, 930 N.W.2d at 847 (quoting *State v. Christopher*, 757 N.W.2d 247, 249 (Iowa 2008)). There are exceptions, though, and one of those exceptions involves trash put out for collection. In *State v. Wright*, this court held—contrary to federal Fourth Amendment precedent—that a police officer violated article I, section 8 of the Iowa Constitution when he removed trash from a garbage can that had been put out for collection. 961 N.W.2d 396, 419 (Iowa 2021). Bauler argues that *Wright* enables her to prevail under article I, section 8 even if her Fourth Amendment claim might be unsuccessful.

We begin by summarizing *Wright*. It is important to note that some of the lead opinion in *Wright*—specifically parts II, III, and IV(A), including footnote 5—did not have the support of a majority. *See id.* at 420 (Appel, J., specially concurring). In the portions of the opinion that had the support of a majority, this court decided: (1) that the defendant had not abandoned the garbage because a local ordinance prohibited anyone from taking or collecting any solid waste which has been put for collection "unless such person is an authorized solid waste collector," *id.* at 415–16 (quoting Clear Lake, Iowa, Code of Ordinances § 105.11(4) (2003)); (2) that the officer committed a trespass because he violated this ordinance, *id.* at 416–17; and (3) that the officer also violated the defendant's reasonable expectations of privacy because the defendant had a reasonable expectation of privacy based on the ordinance, *id.*

during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures." (citation omitted)).

at 418–19.[2] In other words, *Wright* appeared to hang its hat primarily on the terms of a local ordinance prohibiting "scavenging." *See id.* at 415–17. In doing so, *Wright* incorporated concepts set forth in a 2016 law review article—William

---

[2]The dissenters maintained that the majority had read the ordinance out of context and without its title and headings:

> The ordinance making it unlawful to rummage through other people's garbage cans is intended to prevent some of the adverse side effects of rummaging, such as items being removed from garbage cans and ending up as litter on the ground. It is not intended to confer some kind of higher privacy status on garbage that it would not otherwise have. We know this because the stated purpose of this chapter is "to protect the citizens of the City from such hazards to their health, safety and welfare as may result from the uncontrolled disposal of solid waste."

> It is also important to review the Clear Lake ordinance as a whole. It reads,

> Prohibited Practices.

> It is unlawful for any person to:

> 1. Unlawful Use of Containers. Deposit refuse in any solid waste containers not owned by such person without the written consent of the owner of such containers.

> 2. Interfere with Collectors. Interfere in any manner with solid waste collection equipment or with solid waste collectors in the lawful performance of their duties as such, whether such equipment or collectors be those of the City, or those of any other authorized waste collection service.

> 3. Incinerators. Burn rubbish or garbage except in incinerators designed for high temperature operation, in which solid, semisolid, liquid or gaseous combustible refuse is ignited and burned efficiently, and from which the solid residues contain little or no combustible material, as acceptable to the Environmental Protection Commission.

> 4. Scavenging. Take or collect any solid waste which has been placed out for collection on any premises, unless such person is an authorized solid waste collector.

> 5. Burn Barrels. Burn solid waste in any burn barrel or other type of container.

> 6. Landscape Waste. Burn any landscape waste/yard waste.

> Ordinance 105.11(4) is thus part of a list of "Prohibited Practices." The entire list is aimed at activities that interfere with the orderly collection of trash and lead to unsanitary conditions. Public health is the concern, not private property. Hence, the Clear Lake ordinance doesn't alter the reality that trash is trash.

*Wright*, 961 N.W.2d at 460–61 (Mansfield, J., dissenting) (first quoting Clear Lake, Iowa, Code of Ordinances § 105.01; and then quoting *id.* § 105.11).

Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821 (2016) [hereinafter Baude & Stern]. *See Wright*, 961 N.W.2d at 416–17.

Bauler argues that *Wright* compels the dog sniff to be invalidated in this case. However, unlike in *Wright*, where a local ordinance prohibited scavenging from garbage cans, there is no statute or ordinance that prohibits touching a car.

Criminal trespass is defined in Iowa Code section 716.7(2)(*a*), subparagraphs (1)–(7). Three of those subparagraphs relate to property not at issue here. *See* Iowa Code § 716.7(2)(*a*)(5) (railway property), (6) (public utility property), (7) (dwellings). Another three subparagraphs criminalize the "entering" or "remaining" upon property. *See id.* § 716.7(2)(*a*)(1), (2), (3). The remaining subparagraph provides that a trespass includes "[b]eing upon or in property and wrongfully using, removing therefrom, altering, damaging, harassing, or placing thereon or therein anything animate or inanimate, without the implied or actual permission of the owner, lessee, or person in lawful possession." *Id.* § 716.7(2)(*a*)(4). There is no evidence Rohmiller or the dog committed any of these acts. There is also no evidence of wrongful use, alteration, or damage. And "placing," as used in this statute, means putting something on the property and not merely touching the property. *See State v. Geddes*, 998 N.W.2d 166, 180–81 (Iowa 2023). So, this aspect of *Wright* is a dead end for Bauler.

Yet Bauler insists that Officer Rohmiller—and the dog under his supervision—committed a common law trespass which also constitutes a search under *Wright*. She notes that *Wright* has the following expansive language, which also appears in a portion of the opinion that had majority support:

> Article I, section 8 precludes a peace officer from engaging in general criminal investigation that constitutes a trespass against a citizen's

house, papers, or effects. No department of the government can circumvent this constitutional minimum.

961 N.W.2d at 417.

This is *Wright*'s second theory. It is different from a positive law theory; instead, it resembles the "trespass theory" that the authors of the 2016 law review article distinguished. *See* Baude & Stern, 129 Harv. L. Rev. at 1833–36 ("Distinguishing the Trespass Theory."). While the legislature can change positive law (and recently has done so in the area of trash pulls, *see* 2022 Iowa Acts ch. 1022, § 1 (codified at Iowa Code § 808.16 (2023))), the foregoing passage from *Wright* indicates that article I, section 8 protections against trespass are supreme and that the legislature is powerless to circumvent them.

Notably, in *State v. Burns*, our court had to apply *Wright* in another trash case, involving a used drinking straw that had been left behind by a suspect, picked up by police, and then subjected to DNA identity testing. 988 N.W.2d 352, 358, 365–67 (Iowa 2023). Indeed, the defendant made *Wright* the centerpiece of his argument in *Burns*. *Id.* at 365–67. That's not surprising because *Burns*—like *Wright*—was a trash case.

In *Burns*, our court evaluated and rejected the defendant's claims under *both* the positive law *and* the trespass theories of *Wright*. *Id.* at 366–67. We first found that the police didn't violate article I, section 8 under the positive law theory because the statute that limited DNA testing by the public exempted law enforcement officers. *Id.* at 366. Query whether this was actually consistent with *Wright*, which quoted Baude & Stern with approval, stating that "Fourth Amendment protection . . . is warranted when government officials either violate generally applicable law *or avail themselves of a governmental exemption from it*." *Wright*, 961 N.W.2d at 416 (emphasis added) (quoting Baude & Stern, 129 Harv. L. Rev. at 1825–26). *Wright* indicates that the government can't get around

article I, section 8 limits flowing from a generally applicable statute by exempting itself from that statute. *Id.* But we concluded otherwise in *Burns*. 988 N.W.2d at 366–67.

In *Burns*, we then turned to "the trespass standard set forth in *Wright.*" *Id.* at 367. And we found the police actions didn't violate article I, section 8 under *Wright*'s trespass theory because the straw was no longer the defendant's property when the police seized and tested it. *Id.*[3]

Here, Bauler presses an argument under the *Wright* trespass theory. She contends that Officer Rohmiller, via the dog, "physically intruded" on her car and thus violated article I, section 8. She points to the recent decision by the Idaho Supreme Court in *State v. Dorff*, 526 P.3d 988 (Idaho 2023). *Dorff*, like this case, involved a dog sniff where the dog made brief contact with the exterior of a vehicle while performing its sniff. *Id.* at 991–92. The Idaho court concluded that such a sniff violated the Fourth Amendment. *Id.* at 999. The court discussed the common law of trespass at great length. *Id.* at 994–97. Based on that discussion, the court ultimately concluded, by a narrow majority, that the defendant's Fourth Amendment rights were violated because the drug dog "intermeddled with (and thereby trespassed against) Dorff's vehicle for the purpose of obtaining information." *Id.* at 998.

Although we think the Idaho Supreme Court erred in its ultimate conclusion, it was correct about the common law of trespass. The Restatement of Torts is clear. Section 217, "Ways of Committing Trespass to Chattel," explains that any "intermeddling" amounts to trespass and " '[i]ntermeddling' means

---

[3]Two of the three justices remaining on our court who had joined the *Wright* majority dissented in *Burns* and didn't discuss *Wright*. *See* 988 N.W.2d at 382–88 (Oxley, J., dissenting); *id.* at 388–99 (McDermott, J., dissenting). They found instead that the search violated the Fourth Amendment. *Id.* at 392–95 (McDermott, J., dissenting).

intentionally bringing about a physical contact with the chattel." Restatement (Second) § 217, at 417; *id.* § 217 cmt. *e,* at 419.[4] Accordingly, if the handler guides the dog so that the dog is highly likely to make even brief contact with the vehicle, intermeddling has occurred.[5]

We also agree with the Idaho Supreme Court that whether a trespass has occurred is a different question from whether the person who suffered the trespass has a cause of action. *See Dorff,* 526 P.3d at 996 ("[W]hether a 'trespass' was *actionable* in the absence of damages at common law is beside the point for purposes of determining legal relations under the Fourth Amendment."). No damages may mean no lawsuit. We doubt the defendant in *Wright* could have sued for deprivation of his garbage, but that did not affect the majority's conclusion that an article I, section 8 violation had occurred. The Restatement makes the very same point:

> A trespass, though not actionable under the rule stated in §§ 218-220, may nevertheless be important in the determination of the legal relations of the parties. Thus, the fact that one person is committing a trespass to another's chattel, while it may not be actionable because it does no harm to the chattel or to any other legally protected interest of the possessor, affords the possessor a

---

[4]Section 217 reads in full:

A trespass to a chattel may be committed by intentionally

(a) dispossessing another of the chattel, or

(b) using or intermeddling with a chattel in the possession of another.

Restatement (Second) § 217, at 417.

[5]We frequently rely on the Restatement of Torts as a source of the common law of trespass. *See, e.g., White v. Harkrider,* 990 N.W.2d 647, 655 (Iowa 2023); *Nichols v. City of Evansdale,* 687 N.W.2d 562, 567–68 (Iowa 2004); *Robert's River Rides, Inc. v. Steamboat Dev. Corp.,* 520 N.W.2d 294, 301–02 (Iowa 1994), *abrogated on other grounds in Barreca v. Nickolas,* 683 N.W.2d 111 (Iowa 2004); *City of Des Moines v. Webster,* 861 N.W.2d 878, 883–84 (Iowa Ct. App. 2014).

privilege to use force to defend his interest in its exclusive possession.

Restatement (Second) § 217 cmt. *a*, at 417.

So we think Officer Rohmiller (both personally and via the dog) technically committed a common law trespass here. If *Wright* is applied, the dog sniff here does not survive.

In our view, though, *Wright* does not apply to dog sniffs. A dog sniff is far removed from a human trash pull. The existing Fourth Amendment precedent is sound and should apply under article I, section 8.[6] As noted, it holds that dog sniffs are "sui generis" because they only detect contraband. *See Caballes*, 543 U.S. at 409; *Place*, 462 U.S. at 707.

Obviously, a dog is not the same as a human. No one cares if a dog examines their cell phone or follows them into the bathroom. So applying common law concepts derived from human interactions in an anthropomorphic manner to dog sniffs makes no sense.[7] When a handler, in the course of an otherwise lawful exterior dog sniff, briefly touches and allows the dog to briefly touch the outside of the vehicle, that innocuous occurrence should be considered a nonevent. Would anyone complain if a dog sniffing parked cars for explosives outside our state capitol building briefly put its paws on one of those vehicles? If there's an issue, it's the dog sniff itself, not the paws. A dog sniff that takes place in the open air, and does not go beyond the normal scope of a dog sniff, is as valid under article I, section 8 as it is under the Fourth Amendment.

---

[6]*See, e.g.*, *State v. Cyrus*, 997 N.W.2d 671, 676 (Iowa 2023) ("[The defendant] argues we should construe the Iowa clause as providing greater protection against seizures than the Fourth Amendment. Because the federal and Iowa search and seizure clauses are worded nearly identically and we are not persuaded to apply them differently in this case, we will analyze both provisions together.").

[7]This is one reason why we, unlike the authors of many judicial opinions, haven't referred to the dog by name. The issue isn't a lack of affection for the dog or respect for its skills. It's that naming the dog can lead to a mindset in which the dog takes on human traits for legal purposes.

This is the very point made by the dissenters in *Dorff*. Three justices joined the majority in *Dorff*, whereas two dissented. *See Dorff*, 526 P.3d at 999; *id.* at 999 (Moeller, J., dissenting); *id.* at 1002 (Bevan, C.J., dissenting). Both dissenting opinions took note of the sui generis nature of dog sniffs and the ways drug dogs are trained to use their body to pick up scents. *Id.* at 1001 (Moeller, J., dissenting) ("While a dog's paws convey no olfactory information, they allow the dog to sniff higher . . . just as pressing their nose against a door crack allows a drug dog to detect faint smells, [and] wagging their tails against the car may stir the scent emanating from the car around them."); *id.* at 1002 (Bevan, C.J., dissenting) (" 'I do not believe that a drug-detection dog's instinctive action instantaneously transmutes a warrantless, exterior sniff into an unconstitutional search.' It remains my view that a dog's instinct to jump cannot be imputed to its officer-handler when the dog acts without instruction." (quoting *State v. Howard*, 496 P.3d 865, 872 (Idaho 2021) (Bevan, C.J., dissenting))). In their view, "[t]his minimal contact *outside the vehicle* is not police misconduct; it's just a dog behaving like a dog." *Id.* at 1001 (Moeller, J., dissenting). Those dissents are persuasive to us.

There is another reason why invoking technicalities of common law trespass to define the scope of a lawful dog sniff does not make sense. Dog sniffs do not go back that far in time. *See* Charles L. W. Helm, Note, *A Huff and a Puff is No Longer Enough: How the Supreme Court Built a House of Bricks with Its Decision in* Florida v. Jardines, 9 Liberty U. L. Rev. 1, 11 (2014) ("[T]he true beginning of the modern K-9 unit was not until 1888 when the London Metropolitan Police Force utilized two bloodhounds in an attempt to track and capture the infamous Jack the Ripper.").

Certainly independent state constitutional interpretation serves an important role, but in search-and-seizure law there should be a good reason

before we subject Iowa law enforcement to two different standards of conduct, depending on whether the case has landed in federal or state court. *See State v. Baldon*, 829 N.W.2d 785, 842 (Iowa 2013) (Mansfield, J., dissenting). We decline to require the adoption of two different courses of K-9 instruction in Iowa—one for dogs that will be working on federal cases, and another for dogs working for the state. We hold that the dog sniff of Bauler's vehicle did not violate article I, section 8. "[T]he use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409.[8]

**C. The Search of the Purse.** Bauler challenges the warrantless search of her purse, which she had removed from the vehicle prior to the canine sniff. We conclude Bauler did not preserve error on this issue. "Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal." *Taft v. Iowa Dist. Ct.*, 828 N.W.2d 309, 322 (Iowa 2013). Even when a defendant properly raises an issue before the district court, "[i]f the court does not rule on an issue and neither party files a motion requesting the district court to do so, there is nothing before us to review." *Stammeyer v. Div. of Narcotics Enf't*, 721 N.W.2d 541, 548 (Iowa 2006).

Bauler did not raise the search of her purse in her motions to suppress. Bauler's motion to suppress in the drug case discussed only the legality of the traffic stop and Rohmiller's and the dog's contact with her vehicle during the open-air sniff. The word "purse" does not even appear in that motion. Meanwhile,

---

[8]We do not decide whether a dog sniff wherein a dog has been previously trained to put its head inside the car and in fact does so has violates the Fourth Amendment or article I, section 8. *See, e.g.*, *United States v. Corbett*, ___ F. Supp. 3d ___, ___, 2024 WL 780441, at *17 (S.D.W. Va. Feb. 26, 2024) (gathering and discussing caselaw on this point); *United States v. Buescher*, No. 23–CR–4014–LTS–KEM, 2023 WL 5964940, at *4 (N.D. Iowa June 29, 2023) (same). Those are not the facts here.

Bauler's motion to suppress in the OWI case challenged only the legality of the traffic stop.

Bauler nevertheless contends that she preserved error on the purse by bringing the matter briefly to the court's attention during the trial on the minutes. There, Bauler's counsel said the following:

> Again, I wasn't trial counsel at the suppression hearing, but to preserve that issue, as the Court reviews the evidence submitted for trial purposes, we'd also ask that the Court review its decision on the motion to suppress filed October 15 of 2021 and its ruling on December 29, 2021, and take that as a renewed motion to suppress, when the Court has full review of all the evidence.
>
> In particular -- While I know the Court's ruling dealt with this issue, the legitimacy or illegitimacy of the initial traffic stop, the credibility of the officer, and particularly the probable cause that may or may not have existed before the independent search of her purse, which was separate from any K-9 sniff of the vehicle, just have the Court review that as all of its grounds for the search, and just indicate in its ruling on the minutes any additional findings the Court may have having reviewed the full file.

Assuming arguendo that Bauler could have properly raised this new issue during the trial on the minutes, error is nonetheless not preserved because the district court never decided the issue. In its verdict, the district court didn't discuss the constitutionality of the stop, the canine sniff, or the search of the purse. The district court merely noted the parties' agreement that Bauler preserved the "right to pursue an appeal on the issues raised in the Motion(s) to Suppress," of which the search of the purse was not one. "When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal." *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002)). There was no ruling on this issue in the district court. Bauler failed to preserve error.

**V. Conclusion.**

For the foregoing reasons, we affirm Bauler's convictions and sentence.

**AFFIRMED.**

Christensen, C.J., and Waterman, J., join this opinion. McDonald, J., files a special concurrence, in which May, J., joins, and Oxley, J., joins as to parts I–II but not the judgment. Oxley, J., files a dissenting opinion, in which McDermott, J., joins as to parts II–VI. McDermott, J., files a dissenting opinion.

**MCDONALD, Justice (concurring specially).**

I concur only in the judgment. I write separately to address Bauler's claim that the canine sniff of the exterior of her vehicle in a public place violated article I, section 8 of the Iowa Constitution.

I.

Article I, section 8 provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated." Iowa Const. art. I, § 8. The text of the "Fourth Amendment to the United States Constitution is materially indistinguishable from article I, section 8." *State v. Wright*, 961 N.W.2d 396, 404 n.3 (Iowa 2021). Although the provisions are materially indistinguishable, the analysis under each provision is different. "Article I, section 8, as originally understood, was meant to provide the same protections as the Fourth Amendment, as originally understood, but the Supreme Court's interpretation and construction of the Fourth Amendment has deviated from the text and original meaning." *Id.* at 412. In *State v. Wright*, we declined to follow the Supreme Court's Fourth Amendment jurisprudence and instead returned to a more textual and historically sound approach to search-and-seizure issues under the Iowa Constitution. *Id.* at 408.

The plurality opinion in this case attempts to walk back this court's independent approach to search-and-seizure jurisprudence, stating that we generally interpret article I, section 8 to track federal interpretations of the Fourth Amendment. This statement is contrary to what this court has done under article I, section 8 and contrary to this court's most recent pronouncement in *State v. Burns*, where we stated that the Supreme Court's interpretation of the Fourth Amendment "should not govern our interpretation of section 8." 988 N.W.2d 352, 360 (Iowa 2023).

In addition to trying to walk back this court's search-and-seizure jurisprudence generally, the plurality opinion attempts to walk back this court's analysis in *Wright* as if it were not settled law, but the plurality opinion fails to mention that this court reaffirmed *Wright* in totality in *State v. Kuuttila*, 965 N.W.2d 484, 486 (Iowa 2021), and *State v. Hahn*, 961 N.W.2d 370, 372 (Iowa 2021). In *Burns*, we then applied the *Wright* framework outside the home and concluded that it provided the defendant with no relief because "the police did not trespass against or otherwise seize or search Burns's person, his house, his papers, or his effects." 988 N.W.2d 352 at 367. Contrary to the plurality's desire, *Wright* is a controlling framework for evaluating claims arising under article I, section 8, as reaffirmed in *Kuuttila, Hahn,* and *Burns*. District courts are thus "duty-bound to apply it." *State v. Laub*, 2 N.W.3d 821, 828 (Iowa 2024) (discussing vertical stare decisis).

## II.

Bauler contends that the canine sniff of her vehicle in a public place constituted a physical trespass against her personal property and violated her constitutional rights as articulated in *Wright*. In the context of a general criminal investigation, the *Wright* framework is straightforward. First, the court must determine whether the officer engaged in "a seizure or search within the meaning of article I, section 8." *Wright*, 961 N.W.2d at 413. If so, the court must determine whether the seizure or search involved those things enumerated in the constitution—persons, houses, papers, and effects. *See id.* at 414. If so, the court must determine whether the seizure or search involved the defendant's person or the defendant's houses, papers, and effects. *See Burns*, 988 N.W.2d at 367 (stating "that *each* person has the right to be secure against unreasonable searches and seizures in *his own* person, house, papers, and effects." (quoting *Wright*, 961 N.W.2d at 415)). Finally, if an officer engaged in general criminal

investigation conducted a warrantless search of the defendant's constitutionally protected person, house, paper, or effects, the court must determine whether the search was reasonable within the meaning of article I, section 8. *See Wright*, 961 N.W.2d at 416.

I have little trouble concluding that Rohmiller and Ace's examination of the exterior of the vehicle was a search within the meaning of the Iowa Constitution. There is no evidence that "search" was a "term[] of art at the time of the founding." *Id.* at 413. "Search" should thus be given its ordinary meaning. *Id.* Historical dictionaries defined "search" as "an examination conducted for the 'purpose of discovering proof of . . . guilt in relation to some crime.' " *Id.* (quoting 2 John Bouvier, *A Law Dictionary* 498 (3d ed. 1848)). A search meant "[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief." *Id.* (alteration in original) (quoting *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001)). A canine unit walking around the exterior of a vehicle for the purpose of detecting contraband inside the vehicle is a search within the ordinary meaning of the word "search."

There is no dispute that Bauler's vehicle is an effect within the meaning of the constitution and that the vehicle belonged to Bauler. The modern understanding of the term effects is "[m]ovable property; goods." *Effects, Black's Law Dictionary* 651 (11th ed. 2019). This is consistent with the original meaning of the constitution. *See Wright*, 961 N.W.2d at 414 ("The Framers would have understood the term 'effects' to be limited to personal, rather than real, property." (quoting *Oliver v. United States*, 466 U.S. 170, 177 n.7 (1984))). "It is beyond dispute that a vehicle is an 'effect' as that term is used" in our search-and-seizure jurisprudence. *United States v. Jones*, 565 U.S. 400, 404 (2012). There is also no dispute that the car belonged to Bauler and that she was

in possession of the vehicle at the time of the traffic stop. *Cf. Burns*, 988 N.W.2d at 367 (holding that *Wright* did not apply because the subject evidence no longer belonged to the defendant when confiscated).

The final step in the *Wright* analysis is whether the warrantless search of the exterior of Bauler's vehicle was unreasonable within the meaning of article I, section 8. 961 N.W.2d at 416. Under *Wright*, the word "unreasonable" is not used "in a relativistic, balancing sense." *Id.* at 404. Instead, the court must determine whether the search was "unlawful, tortious, or otherwise prohibited" as judged by the positive law of this state. *Id.* at 416 (explaining that a warrantless search may be unlawful if it violates " 'democratically legitimate sources of [positive] law'—statutes, rules, regulations, orders, ordinances, judicial decisions, etc." (alteration in original) (quoting *Carpenter v. United States*, 585 U.S. 296, 398 (2018) (Gorsuch, J., dissenting))). Stated differently, under *Wright*, when an officer conducts a criminal investigatory search, and the search is not in violation of Iowa law, the officer has no need or legal obligation to obtain a search warrant to legally justify the search. *Id.* (citing William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1825 (2016) (concluding that an officer does not need the legal justification of a search warrant unless the officer has "done something that would be tortious, criminal, or otherwise a violation of some legal duty")); Danielle D'Onfro & Daniel Epps, *The Fourth Amendment and General Law*, 132 Yale L.J. 910, 935 (2023) (explaining that where the officer's conduct is not in violation of the law, "the analysis stops").

The positive law framework adopted in *Wright* for assessing the legality of a general criminal investigation has long been the law of this state. Prior to this court's adoption of the exclusionary rule in 1965, there was no freestanding body of state constitutional search-and-seizure jurisprudence that allowed judges to

impose their personal views on when a peace officer's conduct went too far. *See Burns*, 988 N.W.2d at 379–81 (McDonald, J., concurring). Instead, a peace officer's conduct was regulated by the positive law of this state, including statutes, ordinances, and the generally applicable law as announced by this court. The positive law was enforced by criminal prosecutions and civil suits against allegedly offending peace officers. With respect to civil suits, as we explained last term, an aggrieved person had no independent constitutional claim but "could pursue an action for damages against local law enforcement" because "[a] trespassing officer [was] liable for all wrong done in an illegal search or seizure." *Burnett v. Smith*, 990 N.W.2d 289, 300 n.5 (Iowa 2023) (quoting *State v. Tonn*, 191 N.W. 530, 535 (Iowa 1923), *abrogated by State v. Hagen*, 137 N.W.2d 895 (Iowa 1965)). "[T]he notion was simply that the victim of a wrongful search could pursue a *common law* trespass claim." *Id.* "[T]hese causes of action did not depend on the existence of article I, section 8, but were traditional common law claims and would have gone forward even if article I, section 8 were not part of our constitution." *Id.* at 297 (alteration in original) (quoting *Godfrey v. State*, 898 N.W.2d 844, 888 (Iowa 2017) (Mansfield, J., dissenting), *overruled by Burnett*, 990 N.W.2d 289); *Lennette v. State*, 975 N.W.2d 380, 405 (Iowa 2022) (McDonald, J., concurring) ("By the time the citizens of Iowa ratified the Iowa Constitution in 1857, it was well established throughout the country that government officials could be, and regularly were, subject to nonconstitutional causes of action for monetary damages.").

*Wright* re-established a link between the historical positive law approach to regulating peace officer conduct and the constitutional text. "The original meaning of article I, section 8 was to prohibit an officer engaged in general criminal investigation from committing a trespass against a citizen's person, house, papers, and effects without first obtaining a warrant." *Wright*, 961 N.W.2d

at 412 n.5. We further explained that a legal trespass—a legal injury or legal wrong caused by a violation of the generally applicable law—could thus change over time without altering the meaning of the general constitutional prohibition against unreasonable searches and seizures. *See id.* ("The scope of what constitutes a trespass has changed, not the meaning of article I, section 8."). Applying that framework in *Wright*, we held that the officer's search of the defendant's garbage was unconstitutional because it violated positive law, specifically a municipal ordinance that made it a crime for anyone other than a licensed collector to access garbage set out on the curb. *See id.* at 417. This positive law approach was subsequently reaffirmed in *Kuuttila*, 965 N.W.2d at 486, and *Hahn*, 961 N.W.2d at 372.

Under the *Wright* framework, Bauler contends that the open-air sniff around the exterior of her vehicle was unlawful because Rohmiller and Ace "physically intruded" upon her car. Bauler contends that touching her vehicle without her consent constituted a trespass to chattels. The best case in support of Bauler's argument is *State v. Dorff*, 526 P.3d 988 (Idaho 2023). In *Dorff*, an officer initiated a traffic stop of a vehicle. *Id.* at 991. As in this case, law enforcement used a canine unit to determine whether there was contraband in the vehicle. *See id.* The canine unit "never entered the interior compartment of the vehicle." *Id.* During the investigation, however, the canine unit sniffed the vehicle's seams and touched the vehicle on three occasions, including one occasion where the canine planted "his front paws to stand up on the door and window as he sniffed the vehicle's upper seams." *Id.* The Idaho Supreme Court concluded the warrantless open-air sniff violated the Fourth Amendment. *Id.* at 999. The court reasoned that physical contact with chattel that amounts to "intermeddling" with the chattel constitutes a trespass to chattel. *See id.* at 997. In the court's view, the canine's touches were "forms of 'intermeddling' [that]

violate[d] the dignitary interest in the inviolability of a chattel"—"[m]ore specifically, and depending on the circumstances, such 'intermeddling' violate[d] the rights to possess, use, or exclude, or some combination of these rights." *Id.* at 998. In reaching that conclusion, *Dorff* relied heavily on Blackstone, the Restatement (First) of Torts, and general common law. *See id.* at 997–99.

The reasoning of *Dorff* does not support Bauler's argument under article I, section 8 of the Iowa constitution. Under *Wright*, the court does not look to Blackstone, the Restatements, or general law concepts to determine the legality of a criminal investigatory search, as the Idaho Supreme Court did. Instead, this court must look to the law of this state. After all, peace officers in this state are not charged with knowing and complying with the common law of England, the Restatements, or general law concepts applicable in other jurisdictions; instead, they are charged with knowing and complying with the law of this jurisdiction. *See Spano v. New York*, 360 U.S. 315, 320–21 (1959) (noting "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves"); *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) ("We also note the fundamental unfairness of holding citizens to 'the traditional rule that ignorance of the law is no excuse,' *Bryan v. United States*, [524 U.S. 184, 196] (1998), while allowing those 'entrusted to enforce' the law to be ignorant of it."); *Pierce v. Green*, 294 N.W. 237, 248 (Iowa 1940) ("All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it.").

Rohmiller and Ace's quick and momentary touch of Bauler's vehicle in a public place is not unlawful and is thus not of any constitutional significance under *Wright*. A trespass is "[a]n *unlawful* act committed against the person or

property of another." *Trespass, Black's Law Dictionary* 1810 (11th ed. 2019) (emphasis added); *see* Dan B. Dobbs, *The Law of Torts* § 60, at 122 (2000) ("The tort of trespass to chattels, known in old law as *trespass de bonis asportatis*, is committed by intentionally interfering with the plaintiff's possession in a way that causes legally recognizable harm."). Under Iowa law, trespass against personal property "involve[s] the idea of the violation of a possessory right, as well as forceful damage." *Bever v. Swecker*, 116 N.W. 704, 705 (Iowa 1908). "Unless the right of possession was somehow violated or invaded, the action of trespass [does] not lie." *Id.* This requires something more than the brief physical touch that occurred here. *See, e.g.*, *Podraza v. City of Carter Lake*, 524 N.W.2d 198, 199–200 (Iowa 1994) (affirming jury verdict for trespass against a chattel where the defendant tore down the plaintiff's privacy fence); *N.Y. Life Ins. v. Clay County*, 267 N.W. 79, 81 (Iowa 1936) (stating trespass to personal property requires the violation of a possessory right as well as forceful damage); *Welch v. Jenks*, 12 N.W. 727, 728 (Iowa 1882) (reversing dismissal of claim for wrongful taking of corn); *Patterson v. Clark*, 20 Iowa 429, 430–31 (1866) (involving trespass action for taking possession of wagon); *Ralston v. Black*, 15 Iowa 47, 49 (1863) (stating trespass to chattel occurs only where there is an "unlawful intermeddling with, or an exercise or claim of dominion over property"); *Dyson v. Ream*, 9 Iowa 51, 51–53 (1859) (affirming verdict where the defendant wrongfully took possession of the plaintiff's corn).

At oral argument, Bauler raised a contention that Rohmiller and Ace's search of her vehicle constituted a criminal trespass. I disagree. Criminal trespass is defined in Iowa Code section 716.7(2)(*a*), subparagraphs (1)–(7). Three of those subparagraphs relate to property not at issue here. *See* Iowa Code § 716.7(2)(*a*)(5) (railway property), (6) (public utility property), (7) (dwellings). Three of the subparagraphs criminalize the "entering" or "remaining" upon

property, which are not applicable here. *See id.* § 716.7(2)(*a*)(1), (2), (3). The remaining subparagraph provides that a trespass includes "[b]eing upon or in property and wrongfully using, removing therefrom, altering, damaging, harassing, or placing thereon or therein anything animate or inanimate, without the implied or actual permission of the owner, lessee, or person in lawful possession." *Id.* § 716.7(2)(*a*)(4). There is no evidence Rohmiller or Ace violated this provision. There was no evidence of wrongful use, alteration, or damage. And "placing," as used in this statute, means affixing something to the property and not merely touching the property. *See State v. Geddes*, 998 N.W.2d 166, 180 (Iowa 2023) (stating that the trespass statute requires "plac[ing] something" on the property and not "mere door-knocking").

In sum, I conclude there was no violation of the Iowa Constitution as analyzed under the *Wright* framework. Law enforcement officers searched Bauler's protected effect, her vehicle, without first obtaining a search warrant. The Iowa Constitution does not require officers conducting general criminal investigations to obtain a search warrant in all circumstances. The constitution provides only that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated." Iowa Const. art. I, § 8. Generally, an officer conducting a criminal investigatory search need not obtain a warrant prior to conducting that search unless the search would be "unlawful, tortious, or otherwise prohibited" under Iowa law. *Wright*, 961 N.W.2d at 416. In this case, Rohmiller's and Ace's momentary touching of Bauler's vehicle in a public place during a lawful traffic stop was not unlawful, tortious, or otherwise prohibited under Iowa law. Thus, law enforcement had no obligation to obtain a search warrant prior to conducting the search.

### III.

I conclude the remainder of Bauler's state and federal constitutional claims are without merit. In the interest of brevity, I will not address them separately. I concur in the judgment.

May, J., joins this special concurrence. Oxley, J., joins parts I and II of this special concurrence.

**OXLEY, Justice (dissenting).**

As we noted in *State v. Wright,* "[c]urrent Fourth Amendment jurisprudence is a mess." 961 N.W.2d 396, 410 (Iowa 2021). Be that as it may, we have an obligation to apply that federal jurisprudence as laid out by the United States Supreme Court. A proper application of federal precedent reveals that *Illinois v. Caballes,* 543 U.S. 409 (2005), is irrelevant to Bauler's Fourth Amendment challenge and that a different result is compelled by *United States v. Jones,* 565 U.S. 400 (2012), and *Florida v. Jardines,* 569 U.S. 1 (2013). I must therefore respectfully dissent from the plurality's conclusion that use of the drug dog was not an unreasonable search under the Fourth Amendment to the United States Constitution. I would hold that Bauler's Fourth Amendment rights were violated and would reverse the district court's denial of her motion to suppress evidence obtained following the dog's alert.

**I. The Drug Dog Sniff Did Not Violate Article I, Section 8 of the Iowa Constitution Under Our Independent State Law Analysis.**

Bauler argues that the officer violated her rights under article I, section 8 of the Iowa Constitution when he directed the dog to jump up onto her car, relying on *State v. Wright,* 961 N.W.2d 396 (Iowa 2021). I agree with the special concurrence that when we parted ways with federal search-and-seizure jurisprudence in *Wright,* we made a clean cut. Applying *Wright* to Bauler's claim here, I also agree with the special concurrence that her claim fails. I therefore join parts I and II of the special concurrence.

Having rejected Bauler's state constitutional claim, I turn to her federal claim. And here, I part ways with the plurality's Fourth Amendment analysis as further explained below.

**II. Caballes Has Nothing to Say in a Property-Based Analysis of the Fourth Amendment.**

Two important developments prevent us from relying on *Caballes* to decide Bauler's Fourth Amendment challenge. First, the United States Supreme Court revived[9] a property-based approach for determining whether a search occurred under the Fourth Amendment. *See Jones*, 565 U.S. at 405–06 (describing pre-*Katz*[10] jurisprudence and noting that later cases, including *Katz*, had "deviated from that exclusively property-based approach"). The Court made clear that the property-based approach is independent of the *Katz* expectation-of-privacy framework. *See id.* at 409 ("[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."); *see also Jardines*, 569 U.S. at 11 ("The *Katz* reasonable-expectations test . . . is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas."). Second, the Supreme Court clarified that even though a drug dog can only detect contraband, its use nevertheless constitutes an illegal search under the Fourth Amendment when the drug sniff occurs in a constitutionally protected space. *See Jardines*, 569 U.S. at 11 (holding that officers conducted a search by taking a drug-detection dog onto an individual's front porch).

It is true that officers are allowed to conduct an open-air sniff with a drug-detection dog by "simply walk[ing] around a car," *City of Indianapolis v.*

---

[9]Commentators have challenged whether *Jones* revived something or created something new. *See* Orin S. Kerr, *The Curious History of Fourth Amendment Searches*, 2012 Sup. Ct. Rev. 67, 81–86 (2012) (describing early cases and concluding that "[t]he widespread belief that pre-*Katz* decisions adopted a trespass test appears to be incorrect"). In any event, it is our obligation to apply *Jones*, not question its historical accuracy. *See State v. Brown*, 930 N.W.2d 840, 858 (Iowa 2019) (McDonald, J., concurring specially) ("The [United States] Supreme Court is the final arbiter of the meaning of the Federal Constitution.").

[10]*Katz v. United States*, 389 U.S. 347, 353 (1967) (recognizing "that the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizure"); *id.* at 361 (Harlan, J., concurring) (setting forth the *Katz* two-part test).

*Edmond*, 531 U.S. 32, 40 (2000), during an otherwise lawful traffic stop without offending the Fourth Amendment, *see Caballes*, 543 U.S. at 409. The *Caballes* search analysis is based on the "reasonable expectation of privacy" test described in *Katz* for determining whether police conduct amounts to a search. *See id.* at 407–08.

But there are limits on the use of a drug dog during a routine traffic stop. An officer cannot validly extend the stop beyond the time needed to complete the legitimate mission of the initial seizure, which is resolving the traffic infraction. *See Rodriguez v. United States*, 575 U.S. 348, 357 (2015). This limitation is critical because the *Caballes* line of cases allows the use of a drug-detection dog without any type of suspicion. This is an important distinction from situations involving some level of suspicion that illegal drugs are present. In cases like *United States v. Place*, the Supreme Court recognized that where there is reasonable suspicion that an individual is trafficking drugs to justify a *Terry*-type detention of their luggage, officers may use a drug dog to determine whether the luggage contains contraband given the minimal additional intrusion on the person's privacy interests since the dog can detect only contraband. *See* 462 U.S. 696, 706–07 (1983). Running through this line of cases is the notion that a drug sniff by a trained canine is a lesser intrusion—but it is an intrusion nonetheless. *See id.* at 707 ("A 'canine sniff' . . . is much *less intrusive* than a typical search." (emphasis added)).

### III. Jones Recognized a Distinct Property-Based Test for Determining Whether a Search Occurred, and Jardines Extended That Analysis to Dog Sniffs.

In *United States v. Jones*, police officers attached a GPS device to the underside of Jones's Jeep while it was in a public parking lot and then used it to track his movements over the next twenty-eight days. 565 U.S. at 403. In

defending the conviction against Jones's Fourth Amendment challenge, the government argued that the Court's precedent established that "Jones had no 'reasonable expectation of privacy' in the area of the Jeep accessed by Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all." *Id.* at 406. The Court had previously rejected challenges to government tracking of an individual's whereabouts in two different cases, both involving a package containing a beeper tracking device that found its way inside the defendant's vehicle. *See id.* at 408–10 (discussing *United States v. Karo*, 468 U.S. 705 (1984), and *United States v. Knotts*, 460 U.S. 276 (1983)).

The Court addressed—but did not overrule—both cases in clarifying that the *Katz* expectation-of-privacy test was not the only way to identify whether a search had occurred. *See id.* In *United States v. Knotts*, the defendant challenged the government's use of a beeper to track his vehicle to a cabin as violating the Fourth Amendment. 460 U.S. at 277. The beeper had been placed in a five-gallon drum of chloroform purchased by Knotts's codefendant. *Id.* The *Jones* Court explained that "there had been no infringement of Knotts' reasonable expectation of privacy since the information obtained—the location of the automobile carrying the container on public roads, and the location of the off-loaded container in open fields near Knotts' cabin—had been voluntarily conveyed to the public." 565 U.S. at 408–09 (discussing *Knotts*, 460 U.S. at 281–82).

The second beeper case discussed in *Jones, United States v. Karo,* "addressed the question left open by *Knotts"*: whether installation of the beeper "amounted to a search or seizure." *Id.* at 409 (discussing *Karo,* 468 U.S. at 713). In *Karo,* officers placed the beeper in a container of ether (used to extract cocaine from clothing) that a government informant then sold to individuals under investigation by the Drug Enforcement Administration (DEA). *See* 468 U.S. at 708. When the defendants evaded other surveillance techniques, DEA agents used

the beeper to follow the movement of the container—and ultimately the drugs—over the next four-and-a-half months until it finally arrived at a house rented by three of the codefendants. *Id.* at 708–10. The *Jones* Court concluded that "the installation '*with the consent of the original owner* [did not] constitute[] a search or seizure . . . when the container [wa]s delivered to a buyer having no knowledge of the presence of the beeper'" because the government "came into physical contact with the container only before it belonged to the defendant Karo." 565 U.S. at 409–10 (omission in original) (quoting *Karo*, 468 U.S. at 707).

The length of the surveillance in *Jones* was not a basis for distinguishing *Karo,* nor could it have been since *Karo* involved an even longer period of surveillance. Rather, *Jones* distinguished *Karo*'s holding because it addressed only the *Katz* reasonable-expectation-of-privacy test, not a common law trespassory test. *Id.* at 409. The Supreme Court concluded that *Karo* supported its separate property-based conclusion based on one critical difference: Jones "possessed the Jeep at the time the Government trespassorily inserted the information-gathering device, [putting him] on much different footing" than the defendants in *Karo. Id.* at 410. Although the *Jones* Court discussed the twenty-eight-day period that officers were able to surveil Jones, the fact that Jones possessed the vehicle when the government trespassed on it was the defining difference, not the extent of the surveillance. *Id.*

Having explained the bases for its holdings in *Knotts* and *Karo,* there was no need to address the government's argument that Jones lacked an expectation of privacy "because Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation." *Id.* at 406. "At bottom, we must 'assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Id.* (alteration in original) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). Looking to the text of the Fourth Amendment, which protects

"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," the Court found the case straightforward. *Id.* at 404 (alteration in original) (quoting U.S. Const. amend. IV). "It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment,"[11] and "[t]he Government physically occupied private property for the purpose of obtaining information" by attaching the GPS device to the Jeep's undercarriage. *Id.*; *see also id.* at 410. Thus, these two factors—(1) physically occupying a person's effect (the Court also describes the government's actions as a "physical intrusion") (2) for the purpose of obtaining information—constitute a search under the Fourth Amendment. *Id.* at 404–05.

The second case that directs the analysis here is *Florida v. Jardines*, 569 U.S. 1. In *Jardines*, the Court built on its property-based analysis in *Jones* to hold that officers violated a defendant's Fourth Amendment rights when they brought a drug-sniffing dog onto his porch because they physically entered and occupied the curtilage of his home "to engage in conduct not explicitly or implicitly permitted by the homeowner." *Id.* at 5–6. Notably, the Court recognized that the act of entering the curtilage was not itself unconstitutional since an officer could approach a home and knock on its front door without a warrant "precisely because that is 'no more than any private citizen might do.'" *Id.* at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). "But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else." *Id.* at 9.

---

[11]This was important to the portion of the Court's analysis that distinguished *Oliver v. United States*, 466 U.S. 170 (1984), because an open field is not a constitutionally protected space. *Jones*, 565 U.S. at 410–11 ("Quite simply, an open field . . . is not one of those protected areas enumerated in the Fourth Amendment. The Government's physical intrusion on such an area—unlike its intrusion on the 'effect' at issue here—is of no Fourth Amendment significance." (citations omitted)).

Of import here, the Court rejected Jardines's reliance on *Caballes* and its progeny for the same reason it had rejected reliance on *Knotts* and *Karo* in *Jones*: both lines of cases applied the *Katz* expectation-of-privacy framework to determine whether a search occurred. *Id.* at 10–12 (noting the government's argument in *Jones* that there is no expectation of privacy in one's public movements was "a proposition with at least as much support in our case law as the one [about dog sniffs] the State marshals here"). The fact that a drug dog can only detect contraband played no part in the Court's analysis[12] because the defendant's expectations of privacy are simply irrelevant to *Jones*'s property-based approach. *Id.* at 10–11 ("Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz*.").

Critically, the Supreme Court made clear that the *Katz* expectation-of-privacy test and the *Jones* property-based analysis are separate and distinct methods for determining whether there has been a search for Fourth Amendment

---

[12]*Jardines* began in the Florida state courts, where the Florida Supreme Court faced a split among lower courts on the issue of whether taking a drug dog along for a "knock and talk" violated the Fourth Amendment. *Jardines v. State*, 73 So. 3d 34, 35 (Fla. 2011), *aff'd on other grounds*, 569 U.S. 1. Up to that time, "[a] vast majority of federal and state courts ha[d] interpreted the United States Supreme Court's decisions as holding that dog sniffs are not searches under the Fourth Amendment, even in the context of private residences." *Id.* at 66–68 (Polston, J., dissenting) (footnotes omitted). In siding with cases finding a Fourth Amendment violation, the Florida Supreme Court concluded that a dog sniff at a person's front door "does not *only* reveal the presence of contraband, as was the case in the federal 'sui generis' dog sniff cases discussed above, but it also constitutes an intrusive procedure that may expose the resident to public opprobrium, humiliation and embarrassment, and it raises the specter of arbitrary and discriminatory application." *Id.* at 49 (majority opinion) ("Given the special status accorded a citizen's home under the Fourth Amendment, we conclude that a 'sniff test,' such as the test that was conducted in the present case, is a substantial government intrusion into the sanctity of the home and constitutes a 'search' within the meaning of the Fourth Amendment."). Although that judgment was ultimately affirmed, the United States Supreme Court did *not* affirm on the basis used by the Florida Supreme Court—that the home's "special status" entitled it to greater privacy protections than an individual's vehicle on the side of the road or her luggage in an airport, *id.* Instead, the Supreme Court applied the distinct property-based analysis it had used in *Jones*—which involved a vehicle—that "keeps easy cases easy[:] That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." *Jardines*, 569 U.S. at 11.

purposes. *See United States v. Ackerman,* 831 F.3d 1292, 1307 (10th Cir. 2016) ("[T]he fact the government's conduct doesn't trigger *Katz* doesn't mean it doesn't trigger the Fourth Amendment."); *United States v. Thomas,* 726 F.3d 1086, 1092 (9th Cir. 2013) (describing *Jones* as a watershed opinion that "changed the jurisprudential landscape by holding that [*Katz*] was not the exclusive rubric"); *see also United States v. Poller,* 682 F. Supp. 3d 226, 232 (D. Conn. 2023) (describing *Jones* as "[a] second test for deciding whether a 'search' has occurred"). Indeed, "[l]ower courts recognized *Jones* as a sea change." *United States v. Richmond,* 915 F.3d 352, 357 (5th Cir. 2019); *see also United States v. Sweeney,* 821 F.3d 893, 899 (7th Cir. 2016) ("In recent years, the Supreme Court has revived a 'property-based approach' to identify unconstitutional searches." (quoting *Jones,* 565 U.S. at 405)); *United States v. Katzin,* 769 F.3d 163, 181 (3d Cir. 2014) (en banc) (explaining that "*Jones* fundamentally altered [the] legal landscape by reviving—after a forty-five year hibernation—the Supreme Court's prior trespass theory"); *Oprisko v. Dir. of the Dep't of Corrs.,* 795 S.E.2d 739, 745 (Va. 2017) (recognizing that "*Jardines* announced a new rule" that applies only prospectively). As the Supreme Court describes its holding in *Jones,* "[t]he [Fourth] Amendment establishes a simple baseline . . . : When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, '*a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'* " *Jardines,* 569 U.S. at 5 (emphasis added) (quoting *Jones,* 565 U.S. at 406 n.3). "One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on [constitutionally protected] property to gather evidence is enough to establish that a search occurred." *Id.* at 11.

## IV. Faithful Application of Federal Precedent Following *Jones* and *Jardines* Reveals That Officer Rohmiller Violated the Fourth Amendment.

Employing the two-part test identified in *Jones* and *Jardines*, there is no doubt that Officer Rohmiller was attempting to search (gather incriminating information) by directing Ace to sniff Bauler's vehicle for drugs. Nor is there any doubt that Bauler's vehicle is an effect. *See Jones*, 565 U.S. at 404 ("It is beyond dispute that a vehicle is an 'effect' . . . ."). That the only thing Ace could do is detect contraband is irrelevant to a property-based analysis—it is enough that Ace was used to gather information. *See Jardines*, 569 U.S. at 10–11. The fighting issue is whether Officer Rohmiller, through his use of Ace to gather information, physically intruded or encroached on Bauler's car.

In *Jones*, officers "encroached" on the exterior of a vehicle by attaching a GPS device to its undercarriage for purposes of gathering information. 565 U.S. at 410; *see also Jardines*, 569 U.S. at 11 (identifying the intrusion in *Jones* as physically mounting a GPS to the automobile). The plurality here distinguishes *Jones* by adding a new requirement not placed there by the Supreme Court: that the trespass was an "*extended* physical occupation or physical intrusion" as opposed to the "fleeting contact with the exterior of a vehicle" involved here. (Emphasis added.) The relevant question is not the extent of the trespass but rather the gathering of information through a physical intrusion. *See Jones*, 565 U.S. at 418–19 (Alito, J., concurring in the judgment) (recognizing that attaching the GPS to the Jeep's undercarriage "might have provided grounds in 1791 for a suit for trespass to chattels"). Ace did not merely brush his tail against Bauler's vehicle as he passed by during his open-air sniff. He jumped up on the vehicle in several places (so much so that Bauler complained about him scratching her vehicle as she watched from Deputy Vander Berg's squad car) so he could reach the places that Officer Rohmiller was directing him to sniff.

Whether Ace's actions amounted to a physical intrusion or encroachment of Bauler's effect determines the existence of a Fourth Amendment violation here.

Courts around the country have grappled with the issue of whether a drug dog that jumps up on a vehicle or sticks its nose into the vehicle's interior to enable it to smell for drugs goes beyond what *Caballes* permits. Even before *Jardines*, the federal courts of appeals that addressed the issue qualified their "holding[s] that a dog's instinctive jump into a car does not violate the Fourth Amendment" by adding: "as long as the canine enters the vehicle on its own initiative and is neither encouraged nor placed into the vehicle by law enforcement." *United States v. Sharp*, 689 F.3d 616, 619–20 (6th Cir. 2012) (discussing, and joining, the holdings in *United States v. Pierce*, 622 F.3d 209, 213–14 (3d Cir. 2010); *United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007); and *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989)). Following *Jones* and *Jardines*, courts have either avoiding deciding the issue, *see, e.g., United States v. Pulido–Ayala,* 892 F.3d 315, 318–19 (8th Cir. 2018) (recognizing that where an officer cannot ordinarily search the interior of a vehicle, it is questionable whether a drug dog that jumps inside a vehicle has violated the Fourth Amendment but declining to "explore the problem further" because the officer had probable cause to search the car before the entry based on the dog's "strong reaction" of "immediately" pulling the officer to the open passenger door coupled with the driver's "suspicious reaction to the drug checkpoint"); *Thomas,* 726 F.3d at 1092–93 (recognizing that post-*Jones*, "it is conceivable that by directing the drug dog to touch the truck and toolbox [by jumping into the back of the pickup] in order to gather sensory information about what was inside, the border patrol agent committed an unconstitutional trespass or physical intrusion" but declining to decide the issue by applying the " 'faith-in-caselaw' exception to the exclusionary rule" (quoting Caleb Mason, *New Police Surveillance Technologies and the*

*Good-Faith Exception: Warrantless GPS Tracker Evidence After* United States v. Jones, 13 Nev. L.J. 60, 66 (2012))), or found the Fourth Amendment violated, *see, e.g., United States v. Buescher*, 691 F. Supp. 3d 924, 930, 936, 939 (N.D. Iowa 2023) (granting motion to suppress and holding that canine's actions of "insert[ing] his head into the open window of [a] vehicle" as the dog hung on the side of the car door to sniff for drugs was "[t]he same conduct" of "physically occup[ying] private property for the purpose of obtaining information" that occurred in *Jones* and noting that prior cases that "found no Fourth Amendment violation when a drug-sniffing dog breaks the plane of an open window . . . were largely prior to *Jones* and *Jardines*" (third quoting *Jones*, 565 U.S. at 404)); *State v. Dorff*, 526 P.3d 988, 998–99 (Idaho 2023) (holding that use of drug dog during a traffic stop violated the Fourth Amendment under *Jones* where it "jumped up onto the door, and planted his two front paws on the door (and then the window) as he sniffed the upper seams of the vehicle," actions the court described as "intermeddling" by "violat[ing] the dignitary interest in the inviolability of a chattel"), *cert. denied*, 144 S. Ct. 249 (2023).

Given this struggle, cases applying *Jones* outside of the drug-sniff context help explore its parameters. Since *Jones*, federal courts have been very exacting in applying *Jones*'s holding to an officer's contact with an individual's effects, particularly vehicles. In *United States v. Richmond*, an officer conducting a traffic stop "pushed on [a] tire" he had noticed wobbling, which produced a "solid thumping noise," indicating that "something besides air was inside." 915 F.3d at 354. The defendant consented to a search, which ultimately led to the removal of the tires and the discovery of secret compartments containing methamphetamine. *Id.* at 355. With respect to "the 'reasonable expectation of privacy' question," the court concluded it was bound by its precedent, *United States v. Muniz-Melchor*, 894 F.2d 1430, 1435 (5th Cir. 1990), which held that tapping a propane

tank in the back of a pickup truck was not a search under a *Katz* reasonable-expectations analysis, even if it was technically a trespass. *Richmond*, 915 F.3d at 356. Pushing on the tire would not violate an expectation of privacy since an attendant putting air in the tire would be expected to do the same. *Id.* Critically, though, the court noted that "a precedent binds us only as far as it goes," and it went on to address whether pushing on the tire was nonetheless a search under *Jones*'s property-based approach. *Id.* at 356–57. "In terms of the physical intrusion, [the court saw] no difference between the *Jones* device touching the car and an officer touching the tire." *Id.* at 358.

The United States Court of Appeals for the Fifth Circuit is not alone in its strict application of *Jones*. An officer who physically grasped a vehicle's door handle to open it was found to have engaged in "an intrusion, however slight, that generally constitutes a search." *McHam v. State*, 746 S.E.2d 41, 47–49 (S.C. 2013), *abrogated on other grounds by Smalls v. State*, 810 S.E.2d 836 (S.C. 2018). Swabbing the door handle of a car parked in a public location to collect the driver's DNA was determined to be a search. *See Schmidt v. Stassi*, 250 F. Supp. 3d 99, 101 (E.D. La. 2017). A parole officer who inserted a parolee's key into the door lock of a minivan (an effect) to ascertain the van's owner was found to have engaged in a search under post-*Jones* and *Jardines* Fourth Amendment jurisprudence. *See United States v. Dixon*, 984 F.3d 814, 820–21 (9th Cir. 2020). Similarly, testing a key in an apartment door lock to see if it fits has been determined to be a search under *Jardines*. *See United States v. Bain*, 874 F.3d 1, 15 (1st Cir. 2017). Touching the hood of a vehicle to check if it was still warm on a cold winter morning was found to be a search—despite being a minimal physical intrusion—because it was done for information-gathering purposes. *United States v. Owens*, 917 F.3d 26, 36–37 (1st Cir. 2019) (concluding that the search did not violate the Fourth Amendment because it fell within the

exigent circumstances exception to the warrant requirement). Federal courts have even held that chalking a vehicle's tires to discern how long it was parked in one location constituted a search under *Jones. See Taylor v. City of Saginaw*, 922 F.3d 328, 333 (6th Cir. 2019); *cf. Verdun v. City of San Diego*, 51 F.4th 1033, 1037 (9th Cir. 2022) (holding that even if chalking a tire is a search, it was a reasonable administrative search), *cert. denied,* 144 S. Ct. 73 (2023).

The Idaho Supreme Court addressed this exact situation and found a Fourth Amendment violation under *Jones* and *Jardines* when a drug dog jumped up on the side of a vehicle to sniff the upper seams of the vehicle before signaling its alert to drugs. *Dorff*, 526 P.3d at 996–98. In determining whether the dog had physically intruded or trespassed on the defendant's vehicle, the court relied on both the First and Second Restatements of Torts, which recognize that "whether a 'trespass' was *actionable* in the absence of damages at common law is beside the point for purposes of determining legal relations under the Fourth Amendment." *Id.* at 996 (citing Restatement (First) of Torts § 217 cmt. *a* (1934)); *see also* Restatement (Second) of Torts § 217 cmt. *a,* at 417 (Am. L. Inst. 1965) (moving same principle into the Second Restatement).

I see no defensible distinction between these cases and Rohmiller's actions of directing Ace to jump up onto the outside of Bauler's vehicle so he could smell the upper door areas. *Jones*, *McHam*, *Schmidt, Dixon, Owens, Taylor,* and *Dorff* each involved an officer touching or attaching something to the outside of a vehicle for the express purpose of obtaining information. That the information sought here was the smell of illegal drugs does not make it any less of a search, a point made clear by *Jardines*.

Here, it is critical to remember that this was a suspicionless investigation for drugs. Bauler was detained for a traffic stop solely based on driving slowly

and crossing the center line. The scope of an investigation turns on the permissible basis for an officer's presence in a particular place. In *New York v. Class*, an officer conducting a routine traffic stop reached inside the vehicle to move papers that were obscuring the VIN, which was required to be visible from the outside. *See* 475 U.S. 106, 108 (1986). As the officer reached in, he saw the handle of a gun sticking out from under the driver's seat, and the driver was arrested. *Id.* The Supreme Court agreed this constituted a search, *id.* at 115, but it ultimately concluded the search was "sufficiently unintrusive to be constitutionally permissible" because "the officer simply reached directly for the unprotected space where the VIN was located to move the offending papers," *id.* at 119. Critical to the Court's analysis was the fact that the intrusion was directly related—and limited—to the officer's legitimate purpose of investigating the traffic violation. *Id.*

Compare that case to *Arizona v. Hicks*, where officers investigating a shooting entered a neighboring apartment without a warrant to look for the shooter, other victims, and a weapon. *See* 480 U.S. 321, 323 (1987). Once inside, the officers noticed expensive stereo equipment they suspected was stolen. *Id.* Although recording serial numbers from the equipment that were in plain view did not raise Fourth Amendment concerns, the Supreme Court concluded that the officers engaged in an unconstitutional search when they moved a turntable to locate its serial number on the underneath side. *Id.* at 324–25. The Court rejected Justice Powell's dissenting position that moving the turntable was no different than reading the serial numbers that could be seen without touching the equipment, emphasizing that "the 'distinction between "looking" at a suspicious object in plain view and "moving" it even a few inches' is much more than trivial for purposes of the Fourth Amendment." *Id.* at 325. From this analysis came the well-known line: "A search is a search, even if it happens to disclose nothing but

the bottom of a turntable." *Id.* The officers' observation of the serial numbers in plain view was similar to the gun sighting in *Class*—it was constitutionally permissible because the officers were lawfully in the place to see the serial numbers, even if for a purpose unrelated to the stereo equipment. But even a minimal intrusion on a person's effects—such as moving a turntable—beyond the scope of an officer's valid purpose is impermissible. *Id.*

Officer Rohmiller's use of Ace here is analogous to the difference identified in *Hicks* between recording the serial numbers in plain view without touching anything and moving the turntable to locate a serial number on the bottom side. Bauler was lawfully detained for a traffic violation, so the officers' investigation was limited to that purpose. *Caballes* allows an officer to walk a drug dog around the outside of a vehicle during a traffic stop to conduct an "open air sniff" because the dog, as an extension of the officer, is merely smelling the air in the area where he is permitted to be by virtue of the traffic stop. *See* 543 U.S. at 409–10. But the physical intrusion onto the vehicle that assists the officer in gathering information unrelated to the purpose of the stop is "much more than trivial for purposes of the Fourth Amendment." *Hicks*, 480 U.S. at 325. As in *Hicks*, Ace's physical intrusion onto Bauler's vehicle that allowed him to reach the area where he could smell the drugs was a search for Fourth Amendment purposes. *See id.*

Once a search is identified, the analysis then turns to whether the warrantless search was nonetheless reasonable. Under federal law, privacy expectations only come into play in identifying whether there has been a search; they do not inform the reasonableness of a warrantless search. Rather, reasonableness under the Fourth Amendment turns on whether there is a valid exception to the warrant requirement. *See Riley v. California*, 573 U.S. 373, 382 (2014) ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."). The State does not argue that

any exceptions to the warrant requirement would apply here, and I am aware of none. Officer Rohmiller therefore violated Bauler's Fourth Amendment rights.

**V. We Cannot Duck Application of Jones and Jardines.**

The plurality asserts that *Caballes* dictates the Fourth Amendment analysis and avoids addressing the impact of *Jones* and *Jardines* on drug-sniff cases under a property-based approach. The plurality ducks the issue under the premise that it is not for us to ignore controlling United States Supreme Court cases—even if its subsequent cases foreshadow a case's demise. I do not disagree with that sentiment, but it does not apply here because "[t]he two precedents sit comfortably side by side." *Mallory v. Norfolk S. Ry.*, 600 U.S. 122, 137 (2023) (rejecting party's argument that *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), "seriously undermined *Pennsylvania Fire*[ *Insurance Company of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917)]'s foundations" because "[t]he two precedents sit comfortably side by side"); *see also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 356 (5th Cir. 2024) (Jones, J., concurring in part and dissenting in part) ("Naturally, though, one decision does not overrule another if 'two precedents sit comfortably side by side.'" (quoting *Mallory*, 600 U.S. at 137)).

In *Mallory*, the Supreme Court explained that *International Shoe* did not undermine *Pennsylvania Fire*; "all *International Shoe* did was stake out an *additional* road to jurisdiction over out-of-state corporations." 600 U.S. at 138. The same is true in the Supreme Court's Fourth Amendment jurisprudence. "The *Katz* reasonable-expectations test 'has been *added to,* not *substituted for,*' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." *Jardines,* 569 U.S. at 11 (quoting

*Jones*, 565 U.S. at 409) (majority opinion). While *Caballes* controls under a privacy-based approach, it says nothing of the distinct property-based approach. *See United States v. Lewis*, 38 F.4th 527, 534–35 (7th Cir. 2022) (recognizing that "[t]he Supreme Court has sometimes held that the use of drug-sniffing dogs constitutes a search," and comparing *Jardines*, 569 U.S. at 11–12, as applying a property-based approach with *Caballes*, 543 U.S. at 410, as applying a privacy-based approach). *Caballes* therefore does not allow us to avoid addressing Bauler's property-based Fourth Amendment challenge. *See Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 825 F.3d 149, 164 (3d Cir. 2016) ("We do not disagree with the dissent that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls.' Our disagreement is with which Supreme Court case directly controls. Because the secondary effects doctrine is inapplicable here, [*City of*] *Renton* [*v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986),] does not control." (first alteration in original) (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989))). Thus, the conclusion that there was no violation of the Fourth Amendment under *Caballes* does not end the analysis. That would be like refusing to analyze a claimed violation of a state constitutional provision after concluding a similar federal constitutional provision was not violated. They are two distinct tests, and both must be analyzed.

Here, the plurality's analysis of the Fourth Amendment issue is flawed by its misplaced reliance on *Caballes*, which is simply "unnecessary to consider" under a property-based Fourth Amendment challenge. *Jardines*, 569 U.S. at 11. Bauler does not argue that *Jardines* overruled *Caballes*, so the plurality's string cite of cases that say as much—but do not involve a challenge to a drug dog directed to jump up on a vehicle to search for the smell of drugs—adds little to

the analysis. *See, e.g.*, *United States v. Moore*, No. 22-30009, 2023 WL 6937414, at *3 (9th Cir. Oct. 20, 2023) (finding no Fourth Amendment violation where dog's alert outside of the vehicle provided probable cause for a search *before* the dog leapt inside the vehicle); *Bain*, 874 F.3d at 15 (holding that officers violated Fourth Amendment when they used house key taken from defendant to determine which condominium unit he had stayed in, citing *Jardines* to conclude outside lock was protected as part of the curtilage); *United States v. Lewis*, No. 1:15–CR–10–TLS, 2017 WL 2928199, at *6–8 (N.D. Ind. July 10, 2017) (holding that officer's use of drug dog on open walkway outside of second-floor hotel room did not violate Fourth Amendment).

And I agree that *Caballes* controls when a drug dog conducts an open-air sniff by "simply walk[ing] around a car," *City of Indianapolis*, 531 U.S. at 40 (explaining that an open-air sniff did not transform a checkpoint seizure into a search), such that there is no claim that the dog physically trespassed on the defendant's property for purposes of obtaining information, and therefore there is no basis for a property-based Fourth Amendment violation, *see Dorff*, 526 P.3d at 998 ("Notably, when a drug dog simply sniffs the air surrounding a vehicle, it is not a 'search' under the Fourth Amendment's 'reasonable expectation of privacy' test because there is no 'privacy' interest in the free-air that surrounds a vehicle." (citing *Caballes*, 543 U.S. at 409–10)). The plurality's citation to cases falling into that category likewise adds little to the discussion. *See, e.g.*, *United States v. Winters*, 782 F.3d 289, 294, 304–06 (6th Cir. 2015) (applying *Caballes* to conclude no Fourth Amendment violation where drug dog "immediately alerted to the presence of narcotics near the passenger-side door"); *United States v. Seybels*, 526 F. App'x 857, 859 & n.1 (10th Cir. 2013) (rejecting argument that *Jardines* overruled *Caballes* in a case where the facts did not indicate the dog touched the vehicle); *United States v. Cordero*, No. 5:13–cr–166, 2014 WL

3513181, at *8–9 (D. Vt. July 14, 2014) (same); *State v. Candler*, No. 2015AP2212–CR, 2016 WL 7234714, at *3 (Wis. Ct. App. Dec. 14, 2016) (per curiam) (same, rejecting suggestion that *Jardines* would recognize a curtilage-type protection of the space surrounding a vehicle); *see also United States v. Olivera-Mendez*, 484 F.3d 505, 511–12 (8th Cir. 2007) (concluding in a pre-*Jardines* case that minimal contact with the exterior of a vehicle does "not rise to the level of a constitutionally cognizable infringement" (quoting *Caballes*, 543 U.S. at 409)).

*Caballes* simply does not speak to a property-based Fourth Amendment challenge, and the plurality failed to do the hard work required by federal precedent by hiding behind it.

**VI. Conclusion.**

It is important to recognize that the physical intrusion here was not a casual brush of the vehicle that did not aid Ace in detecting drugs, as suggested by the plurality. *See, e.g.*, *Dorff*, 526 P.3d at 997 ("Intermeddling is the difference between someone who brushes up against your purse while walking by—and someone who, without privilege or consent, rests their hand *on* your purse or puts their fingers *into* your purse before your eyes or behind your back. It is also the difference between a dog's tail that brushes against the bumper of your vehicle as it walks by—and a dog who, without privilege or consent, approaches your vehicle to jump *on* its roof, sit *on* its hood, stand *on* its window or door—or enter *into* your vehicle."). Jumping up onto Bauler's vehicle enabled Ace to reach the top of the door where Rohmiller directed him to sniff, after which he immediately provided investigative information to Rohmiller by alerting to the smell of drugs.

With this important limitation, I would conclude that Officer Rohmiller engaged in an unconstitutional search of Bauler's car under the Fourth Amendment and reverse the denial of her motion to dismiss.

McDermott, J., joins parts II through VI of this dissent.

**McDermott, Justice (dissenting).**

Bauler argues that the dog's climb onto the side of his vehicle while sniffing for drugs violated his search-and-seizure rights under both the United States Constitution and the Iowa Constitution. On the challenge under the United States Constitution, I join parts II through VI of Justice Oxley's dissent and would hold, for the reasons she explains, that the search violated the Fourth Amendment under the United States Supreme Court's precedents. But on Bauler's challenge under our state constitution, I part ways with all my colleagues, and would hold that the search also violated article I, section 8 of the Iowa Constitution.

We interpret the Iowa Constitution independent of the Supreme Court's interpretation of the United States Constitution, even when provisions of the two constitutions contain similar language. *State v. Wright*, 961 N.W.2d 396, 402–03 (Iowa 2021). As a result, provisions in the Iowa Constitution may offer greater or lesser protection than comparable provisions in the United States Constitution. *Id.* at 403–04. "On questions of state constitutional law, the Supreme Court 'is, in law and in fact, inferior in authority to the courts of the States.' " *Id.* at 403 (quoting *McClure v. Owen*, 26 Iowa 243, 249 (1868)). In *State v. Wright*, for instance, we interpreted article I, section 8 of the Iowa Constitution to provide greater protection from a police officer's warrantless search of a citizen's trash bin than the Supreme Court has held exists under the Fourth Amendment. *Compare Wright*, 961 N.W.2d at 419, *with California v. Greenwood*, 486 U.S. 35, 43–44 (1988).

Article I, section 8 states in relevant part that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated." This language divides the analysis

into four questions: (1) Is the subject of the alleged intrusion a person, house, paper, or effect? (2) If so, was it searched or seized? (3) If so, was it the defendant's ("their") person, house, paper, or effect? (4) If so, was the search or seizure unreasonable? Orin S. Kerr, Katz *as Originalism*, 71 Duke L.J. 1047, 1052 (2022).

A main feature of the approach we used in *Wright* does considerable work in the analysis of the state constitutional claim in this case. In *Wright*, we examined whether the police officer's conduct in accessing the defendant's trash bin violated positive law—meaning some existing enacted law or legal doctrine recognized by courts—in analyzing whether the officer infringed the defendant's rights under article I, section 8. 961 N.W.2d at 416–17. A municipal ordinance made it a crime for anyone other than a licensed trash collector to access a trash bin set out for collection. *See id.* at 417. We considered positive law—specifically, whether the existence of the ordinance meant that the officer committed a trespass when accessing the trash bin on the defendant's property—in our analysis of the reasonableness of the search. *Id.* at 416. People may reasonably expect that an officer will not engage in conduct that is "unlawful, tortious, or otherwise prohibited" regarding their "persons, houses, papers and effects." *Id.*; Iowa Const. art. I, § 8. The officer violated the defendant's reasonable expectation of privacy, we held, when the officer committed a trespass to access the trash bin. *Wright*, 961 N.W.2d at 419.

But positive law is not the only approach for analyzing compliance with article I, section 8. The "reasonable expectation of privacy" test from Justice Harlan's concurring opinion in *Katz v. United States* remains the overarching test for determining whether a search-and-seizure violation has occurred. 389 U.S. 347, 360–61 (1967) (Harlan, J., concurring). "Although the courts speak of a single 'reasonable expectation of privacy' test," the label includes "several distinct but

coexisting approaches." Orin S. Kerr, *Four Models of Fourth Amendment Protection*, 60 Stan. L. Rev. 503, 506 (2007). A positive law model is one of several approaches that courts have used to identify whether a particular police action constitutes a search requiring a warrant. *Id.* at 506–08, 516.

What constitutes a "search" of "persons, houses, papers and effects" must bear the same meanings—to have all the same dimensions and coverage—that they had when article I, section 8 was enacted. *See Kyllo v. United States*, 533 U.S. 27, 34 (2001) (Scalia, J.) (discussing the same principle under the Fourth Amendment). Courts confront the constant challenge of applying a constitutional search-and-seizure protection enacted in 1857 to current circumstances even though technological change presents circumstances that people living when the Iowa Constitution was enacted wouldn't have fathomed. In *State v. Burns*, for instance, we recently had to apply the Fourth Amendment and article I, section 8 to a challenge involving DNA evidence. 988 N.W.2d 352, 360–61 (Iowa 2023). DNA was still many years from its discovery when the Iowa Constitution was enacted; even as late as the 1930s, the idea that you could pluck a gene and the DNA that composed it "from your body and take it away for study was as absurd to many [scientists] as the idea that scientists today might capture a stray thought and examine it under a microscope." Bill Bryson, *A Short History of Nearly Everything* 402 (2003).

The *Katz* test serves "as a means of identifying modern equivalents to the physical-entry invasions that occurred" when the Constitution was enacted and thus provides "technology neutrality" in what the Constitution protects. Kerr, Katz *as Originalism*, 71 Duke L.J. at 1050. A modern-day action violates a reasonable expectation of privacy—and is thus unconstitutional—if a founding-era equivalent action would have violated the Constitution. *Id.* So, for instance, even though thermal imaging was unknown in 1791, the Supreme Court in *Kyllo v.*

*United States* recognized that using thermal imaging technology to observe activity within a house is a "search" under the Fourth Amendment on par with a physical inspection. 533 U.S. at 40.

The plurality contends that *Wright*'s holding does not apply in this case because "*Wright* does not apply to dog sniffs" since dog sniffs are "sui generis." Setting aside that such a notion is belied by the holding in *Florida v. Jardines*, 569 U.S. 1, 10–12 (2013)—in which the Supreme Court held that use of a drug-sniffing dog to investigate around a house without a warrant violated the Fourth Amendment—the plurality gives *Wright* too narrow a reading. In *Wright*, we properly considered whether the officer's conduct violated any positive law in accessing the trash bin. *See* 961 N.W.2d at 418–19. This aspect of *Wright*'s holding isn't limited to cases involving trash or questions about whether property has been abandoned.

But the plurality goes on to consider if *Wright*'s holding *did* apply in this case, whether the dog's climb onto the side of Bauler's vehicle to sniff for drugs would violate article I, section 8 under a positive law approach. And on this analysis, I agree with the plurality.

A person commits "trespass to chattel" (in other words, unlawful interference with another's personal property) under the common law when he "intermeddles"—defined as "intentionally bringing about a physical contact"—with someone's personal property. Restatement (Second) of Torts § 217 cmt. *e*, at 419 (Am. L. Inst. 1965). When the police officer guided the dog to enable it to climb onto the side of the vehicle to sniff, the officer "intermeddled" with Bauler's personal property and thus committed a trespass to chattel. *See State v. Dorff*, 526 P.3d 988, 997–98 (Idaho 2023). Whether Bauler could or would sue for the trespass is immaterial for purposes of determining the relative rights of the parties under article I, section 8. *See id.* at 996. The officer's trespass on Bauler's

"effect" (the vehicle) violated a reasonable expectation of privacy. The officer had no warrant, and no recognized exception to the warrant requirement applies. As a result, the district court erred, in my view, in failing to exclude the fruits of the improper search under article I, section 8.

I thus respectfully dissent and would hold that the officer's actions violated the search-and-seizure protections of both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution.